IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MANSOOR KHAN, ) | |
| ) | |
|     Plaintiff, ) | |
| ) | 2:11-cv-00559 |
| v. ) | |
| ) | |
| WEST PENN ALLEGHENY HEALTH ) | |
| SYSTEM, INC., and ALLEGHENY ) | |
| GENERAL HOSPITAL, ) | |
| ) | |
|     Defendants. ) | |

### MEMORANDUM OPINION AND ORDER OF COURT

Presently pending before the Court for disposition is the MOTION FOR SUMMARY JUDGMENT (Doc. No. 31) filed by Defendants West Penn Allegheny Health System, Inc., and Allegheny General Hospital (collectively "AGH"). Attached to the motion are a number of exhibits. Defendants have also filed a brief in support of their motion, Doc. No. 32, and a concise statement of material facts, Doc. No. 33. Plaintiff opposes the motion for summary judgment, and has filed a responsive statement to Defendants' concise statement of material facts, Doc. No. 37, with addendum, Doc. No. 38, as well as a brief in support of his opposition to the motion, Doc. No. 39. Defendants filed a reply brief at Doc. No. 40. The motion has been fully briefed and the motion is now ripe for disposition. For the reasons that follow, the motion will be denied.

#### PROCEDURAL HISTORY

The claim at the heart of this lawsuit stems from the allegedly unlawful termination of Plaintiff from the medical psychiatric residency program during his third year at AGH. Plaintiff originally initiated this action by filing a complaint in which he raised claims of retaliation and disparate treatment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42

U.S.C. §2000e-5 ("Title VII"), and a claim of discrimination under the Pennsylvania Human Relations Act, 43 P.S. §951, *et seq.* ("PHRA").  Doc. No. 1.  On August 30, 2011, Plaintiff amended his complaint, once again raising retaliation and disparate impact claims under Title VII, a discrimination claim under the PHRA, and a pendent state law claim for breach of contract.  Doc. No. 13.  Defendants answered the amended complaint and, following the completion of discovery, have moved for summary judgment.  The Court notes that Plaintiff has since stipulated to the withdrawal of all claims alleged in the amended complaint with the sole exception of the Title VII retaliation claim.  *See* Doc. Nos. 27 & 35.  Accordingly, the Court will consider Defendants' motion for summary judgment on that single remaining basis.

### STANDARD OF REVIEW

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56 (c).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, (1986).

More specifically, the moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact.  Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a *genuine issue for trial*" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986) (quoting Fed. R. Civ. P. 56(e) (emphasis in original)).  An issue is genuine only "if

the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986).

## BACKGROUND

The following facts are taken from the Court's independent review of the parties' motions, the filings in support and opposition thereto, and the record as a whole. As the law requires, all disputed facts and inferences are to be resolved in favor of the nonmoving party. Plaintiff is a Muslim of Pakistani origin who, at the time of the events described in the amended complaint, was a third-year resident in the Psychiatric Residency Program at AGH, which is a four year course of study. Am. Compl. ¶¶ 3, 14-15. In addition to treating patients under the supervision of attending physicians, residents take classes, participate in journal clubs and perform other activities to advance their education in the field of psychiatry. Swanson Dep. 6 (Jan. 27, 2012). At all times relevant, Gary Swanson, M.D., was the program director for the adult residency training program at AGH. *Id*. at 5:6 – 9. Dr. Swanson is also the member of the Residency Education Committee ("education committee") that meets on a periodic basis to discuss and review the progress of residents. *Id*. at 7:2 – 8:5.

A. Plaintiff's termination from the residency program and reinstatement

Prior to the termination of Plaintiff's residency that underpins this case, Plaintiff's participation in the residency program had been previously terminated by a decision of the education committee during his third year. While a detailed analysis of the circumstances that led to that decision is not necessary at this juncture, a brief description is appropriate in order to provide a degree of context to the subsequent actions of the parties. The education committee had discussed concerns regarding Plaintiff's professionalism during his first and second years of residency. While those issues arose prior to the third year, as Dr. Swanson explained, "There

were concerns, but he was doing well enough to pass." Swanson Dep. at 9:9 – 10. During his second year, Plaintiff received a verbal reprimand from Dr. Swanson for a verbal altercation which Plaintiff had with Dr. Padjama Chilikapati, the chief resident. *Id*. at 11:4 – 23. Relatively early in Plaintiff's third year, the education committee revisited its concerns regarding his professionalism (based in part on complaints from patients), and his score on the PRITE examination (a practice test that is taken every year by the residents in preparation for taking the Board examinations at the conclusion of the residency program)[1]. *Id*. at 12:13 – 17; 16:3 – 11; 17:18 – 21. Early into his third year, on September 3, 2008, the education committee issued a deficiency letter to Plaintiff in an effort to help him remediate deficiencies. *Id.* at 17:18 – 21. After Plaintiff responded to the deficiency letter, the education committee met again, and issued a second deficiency letter, this one dated October 10, 1008. *Id*. 17:18 – 18:14. This second deficiency letter informed Plaintiff that the concerns had not been successfully remediated. *Id.* Additional concerns arose, including Plaintiff's proficiency with his cognitive behavioral therapy ("CBT") requirement. *Id*. at 13:18 – 14:19. After a third meeting regarding Plaintiff's lack of progress, the education committee decided to terminate his residency. *Id.* at 18: 9 – 14. The ultimate decision to terminate was based upon the committee's concerns regarding Plaintiff's professionalism. *Id*. at 15:17 – 20. Plaintiff was notified of his termination by letter of March 9, 2009. Doc. No. 31 at exhibit A, Khan Dep. 31 (Dec. 15, 2011).

   Plaintiff appealed his residency termination pursuant to the provisions of the AGH Graduate Medical Education ("GME") Academic Improvement Policy. *See id.* at Dep. Ex. 4. Following a review of the decision, the GME Review Team overturned the termination decision

---

[1] According to Defendants, PRITE stands for Psychiatric Resident in Training Examination, and is published by the American College of Psychiatrists. Doc. No. 33, Def. Conc. Stmt. of Mat. Facts, ¶ 7.

and reinstated Plaintiff into the residency program, but required him to repeat his third year of residency. *Id*. As part of the reinstatement, the Review Team required Dr. Swanson to prepare a detailed and specific remediation plan for Plaintiff to follow. *Id*. On June 30, 2009, Plaintiff signed the "Agreement of Appointment" regarding his reinstatement and the remediation plan prepared by Dr. Swanson. *Id*. at Dep. Exs. 5 & 6.

B.        Plaintiff is reinstated to begin his third year residency again

The remediation plan included the appointment of a faculty mentor, Dr. Anthony Mannarino, to assume a support role for Plaintiff as he again undertook his third year of residency. Pl. Depo. Tr. pp. 42 – 43; Mannarino Depo. Tr. 36 – 37 (Dec. 21, 2011). At the time, Dr. Mannrino was a vice president at AGH, and was selected, in part, because he had not previously supervised Plaintiff. Mannarino Dep. Tr. pp. 13, 35 – 36. At their first meeting, Dr. Mannarino advised Plaintiff that Dr. Mannarino was not his supervisor, but was there to provide support and be a mentor and advocate. *Id* at pp. 43 – 44. Thereafter, Dr. Mannarino regularly met with Plaintiff to discuss issues, which Dr. Mannarino would thereafter discuss with Dr. Swanson and Dr. Patton Van Nickell, the Department of Psychiatry Chairman. *Id* at pp. 44 – 45. Dr. Mannarino also reviewed progress reports from Drs. Swanson, Kennedy, and Nathan. *Id*. at pp. 46 – 48.

On or about October 30, 2009, Dr. Swanson received notification that Plaintiff had filed a complaint with the City of Pittsburgh Human Relations Commission. Swanson Dep. 35 – 36. Therein, Plaintiff alleged that he had been subjected to different terms and conditions than others during his residency, dismissed from the residency program and subjected to greater scrutiny than other residents due to his Pakistani national origin. *Id*. Dr. Swanson informed Joanne Maier, Dr. Nickell, Dr. Mannarino, AGH Sr. Vice President Debra Caplan, and Cindy

Deluca by e-mail that he had received the complaint, which he turned over to in-house counsel for AGH, Ron Rademacher, for response. Swanson Dep. 35 – 36.

On November 5, 2009, an Army psychiatrist, Nidal Malik Hasan, shot and killed 13 people and wounded 29 others at Fort Hood, Texas. On November 9, 2009, four days after the Fort Hood tragedy, Plaintiff had one of his regular meetings with his mentor, Dr. Mannarino. Mannarino Dep. 67. Among the various topics discussed, Plaintiff advised that verbal feedback was difficult for him to understand because of his attention deficit hyperactivity disorder ("ADHD"), and suggested that written feedback would be easier for him to understand and comprehend. *Id*. at 72 – 75. The parties disagree over the discussion that followed.

According to Dr. Mannarino, Plaintiff's demeanor then changed, and Plaintiff then "leaned over a little bit and then he started" making certain comments to Dr. Mannarino that caused some concern. More specifically, according to Dr. Mannarino, Plaintiff stated that he was "decompensating", which Dr. Mannarino described as a psychiatric term that "generally means that a person feels like he or she is really struggling, having a hard time, kind of deteriorating in the general functioning". Further, Plaintiff reported that he was having "bad thoughts" about hurting himself and stated that, "If I had to die, then someone else should die with me." Mannarino Dep. 78 - 79. Then, according to Dr. Mannarino, Plaintiff spontaneously said, "Thank God I don't have a gun." *Id*. at 82 – 83. Plaintiff did not identify any specific individual(s) that he thought about hurting. *Id*. at 80 – 81. Dr. Mannarino talked about the fact that if Plaintiff did anything to himself or to someone else, Plaintiff's two young children would not have him there as a father. *Id*. at 83. Dr. Mannarino recalls being able to extract a promise from Plaintiff not to do anything to hurt himself or anyone else. *Id*. at 84 – 86. Dr. Mannarino took notes during the course of this meeting with Plaintiff, Mannarino Dep. Ex. 4, and

subsequently used those notes in compiling a written summary of the meeting[2].

Not surprisingly, Plaintiff recalls the conversation somewhat differently. According to Plaintiff, the topic of the Fort Hood shooting was discussed. As Plaintiff explained:

> So I asked Dr. Mannarino, did you see in the newspaper what has happened, you know, in the Fort hood – in a military court, this military doctor has shot. I was working on a project. That project is discrimination in professional settings, and that project was assigned to me by Dr. Michael Franzen almost two weeks earlier, and he had also given me material to work on that project. So I asked [Dr. Mannarino] what do you, in your professional opinion, what is the psychiatric picture of such people who are professional, you know, they are helping people at one moment, and at other moment, they are picking up a gun and shooting the same people, same patients. So he said you are a third-year resident, and you are interested in forensic psychiatry. What's your take? How would you analyze the workings, the thought process of a person who behaves in this erratic fashion? And I'm, of course, not using the same words, but I'm giving you a summary of what happened. I said, well, I think that there are reasons when people become frustrated. People do not see a way out of their frustration. At that time, their thought process becomes distorted, and they act – they tend to see people in a negative way, and they tend to act in a way that if I'm going to die, I'm going to kill somebody, or I'm going to hurt as much damage as possible against the people whom they perceive as their enemies, so they are deranged. And this is – I believe that discrimination could be playing a role in that one too, so that's relevant to my project. And he turned around the question, and he said, have you ever been frustrated? I said, well, everybody gets frustrated from time to time. I mean, it's part of our life, but it doesn't mean that you start – you pick up a gun and start killing people. And then he said, well, do you own a gun? I said, I do not own a gun, and I'm very happy about it because I believe guns breed violence, and if this person did not have a [gun], he won't shoot as many people as he did. I think the topic changed afterwards, and he said he will see me next week …

Khan Dep. 69:12 – 71:8.

Although he did not believe Plaintiff to be an immediate threat to himself or to others, Dr. Mannarino nevertheless took Plaintiff's statements seriously. Mannarino Dep. 83 – 85. After their meeting, Dr. Mannarino "thought for a while about what needed to be done to increase the likelihood that Dr. Khan would be okay," and shortly thereafter went to Plaintiff's office to recommend that he get in touch with someone with the Employee Assistance Program

---

[2] The memorandum is in the record at Doc. No. 31, Khan Dep. Ex. 11, and documents the same quoted language attributed to Plaintiff herein.

("EAP"), which Plaintiff agreed to do. *Id*. Dr. Mannarino then spoke with Dr. Nancy Kennedy, who was Plaintiff's psychotherapy supervisor, and expressed his concerns about what Plaintiff had said, specifically about Plaintiff having "bad thoughts". Mannarino Dep. 90. Dr. Mannarino then called Dr. Swanson to "let him know what was going on." *Id* at 91.

According to Dr. Swanson, he was approached by Dr. Mannarino shortly after the meeting, who shared his concerns over what he had allegedly just heard from Plaintiff. More particularly, Dr. Swanson recalls being informed by Dr. Mannarino that Plaintiff was having "bad thoughts" and that he "had thoughts of wanting to do [Dr. Swanson] harm, and that Dr. Mannarino was concerned about that." Swanson Dep. 51:20 – 52:3. According to Dr. Swanson's testimony during discovery, he was left with the clear implication that, while the threat may not have been limited to him, the threat that Plaintiff "was going to take people down with him" certainly included Dr. Swanson among those "people". *Id*. at 53:3 – 8. Dr. Swanson further testified that he felt that the threat posed to himself was an "immediate" one. *Id*. at 60:2 – 8. At the same time, however, following his conversation with Dr. Mannarino, Dr. Swanson did not contact the police, he did not take any steps to initiate an involuntary commitment procedure, he did not contact human resources, nor did he did contact security. *Id.* at 54:17 – 25, 58:3 – 6.

On or about November 10, 2009, Dr. Mannarino shared his concerns with Dr. Nickell. Dr. Nickell subsequently met with Plaintiff on November 12, 2009. Khan Dep. Ex. 14. Also present during that meeting was the Manager of Human Resources, Joe Oestreicher. According to Defendants, Plaintiff confirmed that he had made comments to the effect that he was glad that he did not own a gun, and that he had thoughts to the effect that if he was going to die, he was going to take other people with him. *Id.* On December 2, 2009, Plaintiff was notified in writing that his residency was terminated based upon his comments which violated AGH hospital policy.

8

Khan Dep. Ex. 14.

For his part, Plaintiff contends that during this particular meeting, he attempted to explain to Dr. Nickell and to Mr. Oestreicher that the comments described in Dr. Mannarino's written summary of the meeting were taken completely out of context, and were not meant to reflect his personal feelings, but that of a person trying to discern what would cause someone to inflict a wave of violence such as that which occurred at Fort Hood.  Khan Dep. 71 – 73.  Following the termination of his residency, Plaintiff sought review of the decision.  Khan Dep. 98.  On January 18, 2010, Plaintiff was informed that Defendants had decided to uphold his termination from the residency program.  Kahn Dep. Ex. 15.  As part of reaching that decision, the letter noted, "We carefully reviewed the testimony you provided along with the testimony of Dr. Swanson, Dr. Mannarino, Dr. Nickell and Joe Oestreicher."  *Id*.  Plaintiff denied that he ever provided any testimony in this regard.  Likewise, when he was asked about this letter, and specifically to the reference about giving testimony, Dr. Mannarino responded, "I have no idea.  I never gave any testimony."  Mannarino Dep. 109:9 – 13.

### LEGAL ANALYSIS

Plaintiff alleges that the December 2, 2009 termination of his participation in the residency program during his third year was in retaliation for his opposition to national origin discrimination, specifically taken in response to his having filed a complaint with the City of Pittsburgh Human Relations Commission.  *See* Doc. No. 13 at ¶¶ 34 – 38.  Defendants contend that summary judgment is appropriate on the relatively straightforward basis that Plaintiff admitted making statements to Dr. Mannarino during a meeting on November 9, 2009, that were construed as a "non-specific" threat to others.  Title VII provides, in pertinent part, as follows:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has

9

> opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

*42 U.S.C. § 2000e-3(a).* In federal employment discrimination cases, the familiar *McDonnell Douglas* formulation regarding the appropriate burdens of proof and allocation of production of evidence governs and guides the analysis of the evidence presented on a motion for summary judgment. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas*, a plaintiff must establish a *prima facie* case of discrimination; if this burden is met, the defendant must then articulate some legitimate, nondiscriminatory reason for the employee's treatment. *Id.* at 802. If the defendant articulates a legitimate, nondiscriminatory reason for the employee's treatment, then the plaintiff must demonstrate that the defendant's stated reasons were a pretext for unlawful action. *Id.* at 804.

The *prima facie* case under *McDonnell Douglas* "is not intended to be onerous." *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995), *cert. denied*, 515 U.S. 1159 (1995). The *prima facie* case raises an inference of discrimination because the courts presume that the challenged acts, if otherwise unexplained, are "more likely than not based on the consideration of impermissible factors." *Id.* To establish a *prima facie* case of retaliation under Title VII, a plaintiff must tender evidence that: (i) he engaged in activity protected by Title VII; (2) the employer took an adverse employment action against him; and (3) there was a causal connection between his participation in the protected activity and the adverse employment action. *Moore v. City of Philadelphia*, 461 F.3d 331, 340 (3d Cir. 2006). Whether the employee opposes, or participates in a proceeding against, the employer's activity, the employee must hold an objectively reasonable belief, in good faith, that the activity they oppose is unlawful under Title VII. *Id.* at 341. It is not necessary for a plaintiff to prove the merits of any underlying

discrimination complaint in order to invoke the anti-retaliation protection of Title VII. *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996). A plaintiff need only have a "good faith, reasonable belief that a violation existed." *Id.* Thus even if Plaintiff did not have a valid claim under Title VII for national origin discrimination, he could still prevail on his Title VII retaliation claim.

Plaintiff's claim is premised upon the notion that the termination of his residency was a retaliatory response to his complaint of national origin discrimination that he had filed shortly before his November 9, 2009, meeting with Dr. Mannarino. There is no dispute that on October 30, 2009, Defendants became aware that Plaintiff had filed a charge of discrimination, that he met with Dr. Mannarino on November 9, was suspended on November 12, and subsequently terminated from the program on December 2, 2009. With their motion for summary judgment, Defendants do not challenge the notion that Plaintiff has presented a *prima facie* case of retaliatory discrimination. Because Plaintiff has met his requirement to present a *prima facie* case, the burden shifts to Defendants to articulate a legitimate, non-discriminatory reason for the adverse action. To that end, Defendants contend that Plaintiff's "non-specific" threats were the basis for the termination as a violation of hospital policy.

Defendants' burden for the purpose of articulating a legitimate, non-discriminatory reason for the adverse action is one of production, not of persuasion. It is well established that both actual workplace violence against fellow employees and threats of violence are legitimate reasons for terminating an employee. *See, e.g.*, *Ward v. Procter & Gamble Paper Prods., Co.*, 111 F.3d 558, 560 (8th Cir. 1996). However, in order to meet their burden, Defendants must produce evidence demonstrating that Plaintiff's residency was terminated because he violated hospital policy by making a threat. In order to do so, Defendants rely upon what occurred during

Plaintiff's meeting with Dr. Mannarino on November 9, 2009. Beginning with the account of Dr. Mannarino himself, Defendants present his deposition testimony (Mannarino Dep. Tr. filed at Doc. No. 31 at Ex. B), as well as two documents: his handwritten notes taken during the course of the interview (Mannarino Dep. Ex. B) and his subsequent summary of the interview (Mannarino Dep. Ex. 8). At the same time, other circumstantial evidence is included in the record that adds an additional level of detail to what actually transpired during that meeting and in the days that followed, that casts a somewhat different light on the nature of any threat allegedly communicated by Plaintiff. More particularly, the record includes inconsistencies between that which Dr. Mannarino purportedly said to Dr. Swanson (that the threat was not specific to any particular individual) and what Dr. Swanson recalls having been told by Dr. Mannarino (that Swanson himself was a target of the threat)(*compare* Mannarino Dep. 80:21 – 81:25 with Swanson Dep. 51:20 – 52:3); the fact that no official apparently notified security or the police following the meeting; the fact that Dr. Mannarino sent a routine e-mail to Plaintiff's various supervisors later that evening reminding them to provide written feedback to Plaintiff regarding his performance in the residency (as Plaintiff had requested); the fact that the investigation into Plaintiff's comments that was started on November 12, 2009 did not actually involve an interview with Dr. Mannarino himself nor with Plaintiff (Mannarino Dep. 104:24 – 105: 18); the fact that Dr. Mannarino himself testified that he believed Plaintiff's residency was terminated "because of his performance in the program, not having anything to do with whatever he said to me" (Mannarino Dep. 101:14 – 17); and the January 18, 2010 response to Plaintiff's request for a review of his termination that included apparent false information that testimony had been given and reviewed (Mannarino Dep. 109:6 – 13). Such concerns, however, do not defeat that which has been otherwise produced by Defendants, but merely affect the

persuasiveness of such reasoning. Accordingly, the Court agrees with Defendants that for the purpose of the motion, they have produced evidence of a legitimate, non-discriminatory reason for the adverse action.

Given this production by Defendants, the *McDonnell Douglas* framework, with its presumptions and burdens, disappears, and the sole remaining issue is "discrimination *vel non*." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *U.S. Postal Service Bd. Of Governors v. Aikens*, 460 U.S. 711, 714, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983)). In other words, the burden shifts back to Plaintiff to prove by a preponderance of the evidence that Defendants' stated reasons "were not its true reasons, but were a pretext for discrimination." *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097. As the Supreme Court has found, the burden to demonstrate pretext has "merg[ed] with the ultimate burden of persuading the court that [Plaintiff] has been the victim of intentional discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). In *Reeves*, the Supreme Court clarified how a claimant can avoid summary judgment under the *McDonnell Douglas* framework. Once the question comes down to pretext, a plaintiff "must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097 (internal quotation marks omitted). A plaintiff could accomplish this goal "by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089.

In *Reeves*, the company claimed that Reeves was fired because he had failed at his responsibility of recording worker attendance. Reeves, however, offered evidence that he properly maintained the attendance records. This evidence, the Supreme Court explained,

persuasiveness of such reasoning. Accordingly, the Court agrees with Defendants that for the purpose of the motion, they have produced evidence of a legitimate, non-discriminatory reason for the adverse action.

Given this production by Defendants, the *McDonnell Douglas* framework, with its presumptions and burdens, disappears, and the sole remaining issue is "discrimination *vel non*." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *U.S. Postal Service Bd. Of Governors v. Aikens*, 460 U.S. 711, 714, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983)). In other words, the burden shifts back to Plaintiff to prove by a preponderance of the evidence that Defendants' stated reasons "were not its true reasons, but were a pretext for discrimination." *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097. As the Supreme Court has found, the burden to demonstrate pretext has "merg[ed] with the ultimate burden of persuading the court that [Plaintiff] has been the victim of intentional discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). In *Reeves*, the Supreme Court clarified how a claimant can avoid summary judgment under the *McDonnell Douglas* framework. Once the question comes down to pretext, a plaintiff "must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097 (internal quotation marks omitted). A plaintiff could accomplish this goal "by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089.

In *Reeves*, the company claimed that Reeves was fired because he had failed at his responsibility of recording worker attendance. Reeves, however, offered evidence that he properly maintained the attendance records. This evidence, the Supreme Court explained,

combined with the strong evidence supporting Reeves's *prima facie* case, was enough to support a jury's verdict of liability. *Reeves*, 530 U.S. at 146, 120 S.Ct. 2097. Thus, the Supreme Court held that "a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 148, 120 S.Ct. 2097 (emphasis added). Such is the case here. To be clear, the Court is not concluding that Defendants' stated reason(s) are false. It is concluding, however, that Plaintiff has presented sufficient evidence at this stage to permit the ultimate trier of fact, after assessing credibility, to determine whether such reasons advanced by Defendants are true and accurate or not.

Accordingly, Defendants' Motion for Summary Judgment, Doc. No. 31, will be denied. An appropriate order follows.

McVerry, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MANSOOR KHAN,** )<br>)<br>**Plaintiff,** )<br>)<br>v. )<br>)<br>**WEST PENN ALLEGHENY HEALTH** )<br>**SYSTEM, INC., and ALLEGHENY** )<br>**GENERAL HOSPITAL,** )<br>)<br>**Defendants.** ) | **2:11-cv-00559** |

## ORDER OF THE COURT

AND NOW, this 31st day of August, 2012, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED**, **ADJUDGED** and **DECREED** that the MOTION FOR SUMMARY JUDGMENT (Document No. 31) filed by Defendants is **DENIED**.

The parties shall file Pretrial Narrative Statements on or before September 21, 2012. Either party may file a supplemental/rebuttal statement on or before October 5, 2012.

The Court will conduct a pretrial conference on Monday, October 15, 2012, at 10:30 a.m. in Courtroom 6C, United States Courthouse, 700 Grant Street, Pittsburgh, PA 15219. The parties, or a person with authorized authority, are directed to attend either in person or be available by phone.

BY THE COURT:

/s/ Terrence F. McVerry
United States District Court Judge

cc:   **John David Newborg, Esquire**
      Email: jdnewborg@aol.com
      **Thomas B. Anderson, Esquire**
      Email: tba@trc-law.com